[Cite as *Nappi v. Nappi*, 2014-Ohio-2696.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| THOMAS NAPPI, | : | **PER CURIAM OPINION** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2013-A-0041** |
| LAUREN NAPPI, | : | |
| Defendant-Appellee. | : | |

Civil Appeal from the Ashtabula County Court of Common Pleas.
Case No. 1996 DR 737.

Judgment: Affirmed.


*Samuel L. Altier*, 1027 Lake Avenue, Ashtabula, OH 44004 (For Plaintiff-Appellant).

*William P. Bobulsky*, William P. Bobulsky Co., L.P.A., 1612 East Prospect Road, Ashtabula, OH 44004 (For Defendant-Appellee).


PER CURIAM.

{¶1} Appellant, Thomas Nappi, appeals the judgment of the trial court clarifying a qualified domestic relations order ("QDRO"), which increased the monthly payment to appellee, Lauren Nappi, from $77.82 per month to $302.77 per month. Based on the following, we affirm.

{¶2} The parties were married on June 15, 1982, and divorced by final judgment on December 16, 1997. Prior to that date, the trial court noted that the parties had reached an agreement as to all the marital issues and granted the parties' divorce

on the ground of incompatibility. The December 16, 1997 Final Decree of Divorce provided the following:

{¶3} "C. Retirement Benefits

{¶4} "1. The marital portion of Plaintiff, Thomas Nappi's retirement benefit with ESAB shall be divided in accordance with the Qualified Domestic Relations Order."

{¶5} The QDRO relative to Thomas's ESAB Welding & Cutting Products Plan ("the Plan") was filed on January 29, 1998. Each party, along with their counsel, signed a separate approval page, which were incorporated into the document. At paragraph 5 of the QDRO, it stated that Lauren would receive the following:

> [F]ifty percent (50%) of Participant's pension entitlements from the date of marriage of June 5, 1982 through December 3, 1997 shall be credited to a separate bookkeeping account under the Plan in the name of Alternate Payee. Such amount, adjusted in accordance with the Plan for any appreciation or depreciation and gains or losses subsequent to the most recent Plan valuation date * * * and prior to the date of distribution, but not adjusted for any contributions or forfeitures under the Plan subsequent to the Valuation Date, shall be payable to Alternate Payee in accordance with Section 6 of this Order.

{¶6} Thomas retired from his ESAB employment on September 1, 2012. The plan, however, had terminated on December 31, 2006. Lauren was notified by ESAB that her share of the pension, after 15.5 years with marital rights in the plan, was limited to $77.82 per month. The Plan Administrator calculated the total benefit amount as $432.61 per month based on the length of the parties' marriage. Then, the Union Carbide portion of the benefit in the amount of $276.98 was subtracted from the total, as Thomas had been employed at Union Carbide prior to the parties' marriage. The calculation resulted in a total net monthly amount of $155.63, of which Lauren was entitled to 50%, or $77.82.

2

**{¶7}** Lauren filed a motion for modification of the QDRO. In her motion, Lauren argued that Thomas was hired on June 6, 1973, and the Plan terminated on December 31, 2005, for a total of 33.58 years in the Plan. She further argued the parties were married for a total of 15.5 years, which represents the marital portion of the Plan. Therefore, the total marital percentage in the Plan is 46.16%, of which Lauren's share is one-half, or 23.08%. As the pension estimate determines that Thomas's "unreduced monthly benefit" is $1,311.88, Lauren claims she is entitled to 23.08%, or $302.77, per month.

**{¶8}** In its judgment entry, the trial court found the following: "The Court finds that it was the intent of the parties herein that the Defendant should receive 50% of the Plaintiff's retirement benefits accrued during the parties' marriage, not 5.93% as determined by the pension plan administrator." Consequently, Lauren's monthly payment was increased from $77.03 per month to $302.77 per month.

**{¶9}** Thomas filed a notice of appeal and asserts the following assignment of error for our review:

**{¶10}** "The Trial Court erred to the prejudice of Plaintiff–Appellant in finding the ESAB QDRO to be ambiguous, and subject to clarification."

**{¶11}** On appeal, Thomas argues the trial court erred, as the QDRO employed a frozen coverture method, i.e., it described a specific period of time for which 50% of Thomas' pension entitlements must be segregated into Lauren's newly-created account.

**{¶12}** While a court has the power to enforce a property division incorporated into a divorce decree, R.C. 3105.65(B), a trial court may not modify that property division. R.C. 3105.171(I); *Bond v. Bond* (1990), 69 Ohio App. 3d 225, 228. However, 'where there is good faith confusion over the requirements of the dissolution decree, a court has the power to enforce its decree, to hear the

3

matter, clarify the confusion, and resolve the dispute.' *Bond*, 69 Ohio App. 3d at 228. Where a clause in the divorce decree is ambiguous, a court 'has broad discretion in clarifying ambiguous language by considering not only the intent of the parties but the equities involved.' *Id.*

*Straw v. Straw*, 9th Dist. Lorain No. 04CA008433, 2004-Ohio-4065, ¶4. In *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 180 (1990), the Ohio Supreme Court stated:

> The trial court must have the flexibility to make an equitable decision based upon the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension plan, and the reasonableness of the result. Thus, any given pension or retirement fund is not necessarily subject to direct division but is subject to evaluation and consideration in making an equitable distribution of both parties' marital assets.

{¶13} The Court identified several ways that a trial court may divide a pension plan, "such as an immediate offset or a current assignment of proportionate shares, with either a current distribution or a deferred distribution. A deferred distribution may consist of either a current assignment or a division of the asset at such time that the plan directs distribution based upon the employee's eligibility." *Id.* at 181. The Court noted that these varied theories are necessary based on the circumstances of each case. "In a situation involving vested but unmatured benefits," it would be appropriate to divide the pension proportionately. *Id.* at 182-184.

{¶14} Below, Lauren argued that her share of the pension should have been calculated according to the traditional coverture method rather than the frozen coverture method, thereby increasing her monthly payments.

{¶15} In addressing vested but unmatured benefits, the *Hoyt* Court outlined a formula whereby the duration of the parties' marriage is divided by the total number of years of employment of the employed spouse. That sum is multiplied by one-half; the

4

consequent percentage is then multiplied by the sum of the retirement benefits. *Id.* at 182.

**{¶16}** Thomas maintains the QDRO at issue explicitly employed the frozen coverture method, thus Lauren's monthly benefit is correct at $77.82.

> **{¶17}** Under the frozen coverture method, or dollar amount, the trial court 'freezes' the pension benefits at the amount in the account as of the divorce date. Sometimes called the 'hypothetical' approach, it calculates the value of the participant spouse's retirement account had he or she retired on the same day the parties divorced, using the then-present base pay and years of service. *Reising v. Reising*, 2d Dist. No. 2010-CA 92, 2012-Ohio-1097, ¶24. Where the participant spouse started working before the marriage, the court can apply a coverture fraction to determine the marital portion of the 'frozen' amount. It does so by dividing the number of years in the plan while the parties were married by the total number of years in the plan at the time of the divorce. * * * Under this approach, the non-participant spouse receives no interest the account accrues after that date.

*Cameron v. Cameron*, 10th Dist. Franklin No. 12AP-349, 2012-Ohio-6258, ¶17.

**{¶18}** Here, however, the trial court determined that it was the intent of the parties that Lauren shall receive 50% of Thomas's retirements benefits accrued during the parties' marriage, not 5.93% as determined by the pension plan administrator.

**{¶19}** The QDRO provides for an award of 50% of Thomas's pension entitlements, from the date of marriage to the date of divorce, to a separate bookkeeping account under the plan in Lauren's name. The language of the QDRO then directs that such amount *be adjusted for any gains or losses* after the most recent "Plan valuation date (the 'Valuation Date')" and "prior to the date of distribution, but not adjusted for any contributions or forfeitures under the Plan subsequent to the Valuation Date[.]" The plan, therefore, anticipates some type of adjustment for gains or losses derived from Lauren's interest. In addition, the term "valuation date" is not defined in

5

the QDRO. The "valuation date" may be the date of the termination of marriage, the date of Thomas's retirement, or another date. Furthermore, we note the QDRO conditions the amount of Lauren's pension entitlements with the term "recent"; the use of this temporal modifier necessarily contemplates a future or additional valuation.

{¶20} Because the QDRO did not clearly define Lauren's interest in Thomas's pension plan, we conclude the trial court did not err in determining it was the intention of the parties that the QDRO employ the traditional coverture formula.

{¶21} The judgment of the Ashtabula County Court of Common Pleas is hereby affirmed.


TIMOTHY P. CANNON, P.J., THOMAS R. WRIGHT, J., COLLEEN MARY O'TOOLE, J., concur.